# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SMITH INTERNATIONAL, INC. | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 16-0056 |
| | : | |
| BAKER HUGHES INCORPORATED | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                                                 July 11, 2018

Plaintiff, Smith International, filed this suit on January 29, 2016 claiming that Defendant, Baker Hughes, infringed two related patents for expandable tools used as a part of well boring devices: 6,732,817 ('817) and 7,314,099 ('099). In general, the patents describe tools that are added towards the end of a drilling assembly which have adjustable arms that expand outward so that, as the drill assembly turns, the expanded tool arms ream the borehole larger. Hydraulic pressure is used to expand and collapse the reaming tool arms. The patented tools also contain stabilizers which help control the trajectory of the drilling assembly. Presently before the Court are the parties' disputes regarding the meaning of various terms found within the claims of the '817 and '099 patents. The Court held a claim construction hearing on June 20, 2018. Below, the Court construes the disputed claims.

I.      **LEGAL STANDARD**

Patent claim construction is a question of law. Teva Pharm. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 837 (2015) (citing Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996)). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention

to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

"[T]he words of a claim 'are generally given their ordinary and customary meaning,'" Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id. at 1313. This person of ordinary skill is deemed to have read the disputed term "in the context of the entire patent, including the specification." Id.

In determining the proper construction of a claim, a court should first look to intrinsic evidence such as the patent itself, the specification, and prosecution history.[1] Vitronics Corp., 90 F.3d at 1582-83. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Id. at 1582. Indeed, the patent specification is usually "dispositive; it is the single best guide to the meaning of a disputed term." Id. "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." Id. at 1583. However, extrinsic evidence may be considered "if needed to assist in determining the meaning or scope of technical terms in the claims." Id. (quoting Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216 (Fed. Cir. 1995)). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. Where the intrinsic record resolves any ambiguity in the disputed term, "it is improper to rely on extrinsic evidence." Vitronics Corp., 90 F.3d at 1583. Ultimately, "[t]he construction that stays true to the claim language and

---

[1] The prosecution history "consists of the complete record of the proceedings before the Patent and Trademark Office and includes the prior art cited during the examination of the patent." Phillips, 415 F.3d at 1317.

most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

## II. CONSTRUCTION OF DISPUTED TERMS

### A. Disputed Terms in '817

#### 1. "means for adjusting said expanded position" (in Claim 2 of '817)

35 U.S.C. § 112 ¶ 6 "allows a patentee to express an element of a claim as a means for performing a specified function." Triton Tech of Texas, LLC v. Nintendo of Am., Inc., 753 F.3d 1375, 1378 (Fed. Cir. 2014). However, "[i]n exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function." Id.

Both parties agree that the relevant function is "adjusting [the] expanded position" of the tool arms used for reaming the borehole. The parties dispute the corresponding structure that performs this function. Plaintiff contends that all of the parts used to expand the tool arms are necessary parts of the overall structure used to adjust the expanded position of the arms. Defendant contends that only the parts actually used to adjust how far the arms can expand, and not the parts used to expand the arms, are the corresponding structure.

- **Plaintiff's Construction:** <u>Corresponding Structure</u>: a mandrel, flow ports, a piston, a spring, a spring retainer, a cap, and equivalents.

- **Defendant's Construction:** <u>Corresponding Structure</u>: a threaded sleeve.

- **Court's Construction:** <u>Corresponding Structure</u>: a spring retainer and upper cap, and equivalents.

"The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as

intended." Asyst Techs., Inc. v. Empak, Inc., 268 F.3d 1364, 1371 (Fed. Cir. 2001). Plaintiff concedes that the purpose of the spring retainer is to limit the full expansion of the tool arms. The '817 specification indicates that "the spring retainer 550, which is a threaded sleeve, can be adjusted at the surface to limit the full diameter expansion of the arms 520." '817 Patent 9:14-16; see id. at 9:18-19 ("[T]he position of the spring retainer 550 determines the amount of expansion of the arms 520."). Once the operator adjusts the spring retainer so that the tool arms will expand to the required diameter, the upper cap locks the spring retainer into place, thus setting the adjustment. Id. at 9:22-24. It is these two items that "adjust[ ] said expanded position," in other words, the amount the tool arms can expand. The remainder of the items cited by Plaintiff move the arms into the expanded position, and thus "enable the pertinent structure to operate," but it is the spring retainer and upper cap that actually adjust the amount of expansion that is possible, and thus, "actually perform the recited function."

As a result, the Court generally agrees with Defendant's position. However, the Court disagrees with Defendant that the corresponding structure is merely a "threaded sleeve," even though the specification indicates that the spring retainer "is a threaded sleeve." Id. at 9:15. This is but one embodiment of the spring retainer and it does not take into account the fact that the upper cap locks the spring retainer into place.

### 2. "directly above the drill bit" (in Claims 43, 55, & 83 of '817)

Plaintiff specifically seeks construction of this term in regards to two phrases: (1) "disposing a first expandable tool . . . directly above the drill bit;" and (2) "said first expandable tool being positioned directly above the drill bit." Plaintiff asserts that the tool is still "directly above" the drill bit as long as there are no intervening drill collars, even if there are other intervening structures that are not drill collars. Defendant contends that in order for the tool to

4

be "directly above" the drill bit, no structure may intervene between the two.

- **Plaintiff's Construction:** (1) Placing a first expandable tool . . . between the drill bit and a drill collar & (2) said first expandable tool being positioned between the drill bit and a drill collar.

- **Defendant's Construction:** Positioned above the drill bit without intervening structures such as drill collars.

- <u>**Court's Construction:**</u> Positioned above the drill bit without intervening structures such as drill collars.

The '817 specification indicates that "[t]he winged reamer 220 may be separated from the drill bit 110 by one or more drill collars 130, but preferably the winged reamer 220 is connected directly above the drill bit 110." '817 Patent 7:28-31. The Court concludes that Plaintiff's construction reads out the word "directly." "Directly" is defined, inter alia, as "in immediate physical contact." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/directly (last visited July 2, 2018); <u>see also</u> Oxford Living Dictionary, https://en.oxforddictionaries.com/definition/directly (last visited July 2, 2018) (defining "directly" as "[w]ith nothing or no one in between"). By its plain meaning, in order for the tool to be "directly above" the drill bit, there must be no additional structures between the tool and drill bit.

### 3. "selectively aligned" (in Claims 47, 48, 59, 60, 61 of '817)

Plaintiff specifically seeks construction of the term: "[the/said] [first/second] expandable tool must be selectively aligned." Defendant claims that the term "selectively aligned" is indefinite. Plaintiff contends that a reading of the related portions of the specification show that "selectively aligned" has a simple meaning: that the fluid ports on the tool can be aligned to make the tool expand and contract as needed.

- **Plaintiff's Construction:** The fluid ports of the [first/second] expandable tool must be selectively aligned.

- **Defendant's Construction:** Indefinite.

- **Court's Construction:** The fluid ports of the [first/second] expandable tool must be selectively aligned.

Defendant claims the term is indefinite because there is no context for what needs to be aligned. However, when viewed in conjunction with the specification, a person of ordinary skill in the art would be able to divine the meaning of the term. In relevant part, the specification asserts that to expand the tool arms, the tool must be "selectively actuated," "which aligns the ports 920 with the ports 595." '817 Patent 12:16-19; see also id. at 12:54-55 ("[T]he tool 900 can be selectively actuated at the election of the operator to align the ports 920 and 595."). Thus, the tool can be selectively actuated to align its fluid ports which allows the tool to expand and contract – which is essentially to say that selectively aligning the tool's ports allows the tool to move. While this formation may seem complicated, it is not indefinite. See S3 Inc. v. NVIDIA Corp., 259 F.3d 1364, 1369 (Fed. Cir. 2001) ("The purpose of claims is not to explain the technology or how it works, but to state the legal boundaries of the patent grant. A claim is not 'indefinite' simply because it is hard to understand when viewed without benefit of the specification.").

    **4.**     **"plurality of angled channels"** (in Claims 1, 62, 64 of '817)

The first dispute regarding this term concerns whether the channels are angled with respect to the axial flowbore of the drilling assembly or the expandable tool arms.

- **Plaintiff's Construction:** Channels angled with respect to the axial flowbore.

- **Defendant's Construction:** Channels angled with respect to the arm.

- **Court's Construction:** Channels angled with respect to the axial flowbore.

6

Figures 4 and 5 of '817 show a multitude of angled channels running at an angle diagonal to the vertical axis or centerline of the tubular drilling assembly. These channels allow the reaming tool arms to extend outward and upward from the drilling assembly. Thus, using the axial flowbore of the drilling assembly (i.e. its vertical centerline) is the easiest and clearest reference regarding to what the channels are angled. The Court disagrees that during the prosecution of the patent, when Plaintiff explained that the ramped surfaces of the Eppink patent were not equivalent to the angled channels, it was disclaiming such a construction. See Prosecution History, ECF No. 83-1 at p. 159-60.

> **5.** **"a plurality of angled channels formed into a wall of said at least one axial recess"** (in Claim 1 of '817)

In an additional dispute regarding the angled channels, the parties disagree what it means to have "a plurality" of channels formed into "a wall." Plaintiff contends that this term means that one wall of the axial recess can have only one channel as long as another wall also has a channel. Defendant asserts that each wall must have multiple channels.

- **Plaintiff's Construction:** Channels angled with respect to the axial flowbore formed into a wall of at least one axial recess.

- **Defendant's Construction:** Each wall of the axial recess contains a plurality of channels angled with respect to the arm.

- **Court's Construction**: Multiple channels angled with respect to the axial flowbore formed into a wall of at least one axial recess.

Where patents are concerned, unless a patentee clearly intends to limit the use of the indefinite articles "a" or "an" to mean only "one," their use means "one or more." Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1342-43 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention."); KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This

7

court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more.'"). Plaintiff has not clearly telegraphed that the use of "a" wall should be limited to mean only "one" wall. Thus, Plaintiff's construction is correct: while there must be multiple channels, those channels may be situated in <u>one or more</u> walls of one or more axial recesses.

> **6.** **"at least one non-pivotable, movable arm . . . having angled surfaces that engage said body to prevent said arm from vibrating in said second position**" (in Claim 28 of '817)
>
> - **Plaintiff's Construction:** At least one non-pivotable, movable arm having angled surfaces that are held in compression with the body to minimize vibration in the second position.
>
> - **Defendant's Construction:** The arm has surfaces on each end that are angled in the same direction to bias the arm to a side of the recess to prevent vibration.
>
> - <u>**Court's Construction:**</u> At least one non-pivotable, movable arm having angled surfaces that are held in compression with the body to minimize vibration in the second position.

Defendant's construction incorporates additional language that is described in the specification as a preferred (but not the only) embodiment of the arm. Specifically, that the top and bottom surfaces of an "exemplary" arm are "angled in the same direction as best shown in FIG. 7," which "bias the arms 520 to the trailing side of the pocket recesses." '817 Patent 10:48-61. Claim 28 itself, where this term is found, only requires that the movable arm have "angled surfaces" to prevent vibration. In that '817 is not limited to the preferred embodiment, Defendant's construction is inaccurate. <u>Comaper Corp. v. Antec, Inc.</u>, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[T]his court has repeatedly cautioned against limiting claims to a preferred embodiment."); <u>see also</u> <u>Phillips</u>, 415 F.3d at 1323 ("[w]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as

8

being limited to that embodiment.").

B. **Disputed Claims in '099**

1. **"a selectively actuatable sleeve"** (in Claim 1 of '099)

Claim 1 of '099 provides that the tool has "a selectively actuatable sleeve that prevents or allows a differential pressure to translate . . . the movable arm between a collapsed position and an expanded position."

- **Plaintiff's Construction:** A sleeve that can be moved longitudinally.

- **Defendant's Construction:** A sleeve that can be repeatedly moved between two positions that open and close the port.

- **Court's Construction:** A sleeve that can be moved longitudinally.

There are two main issues raised by the parties regarding this claim. First, Plaintiff contends that Defendant's construction adds the requirement that the actuation of the sleeve opens and closes the port, which is not in the patent and, according to Plaintiff, is wrong from a technical perspective. Second, Defendant argues that Plaintiff's construction does not adequately incorporate the word "selectively."

The Court agrees with Plaintiff that Defendant attempts to import language ("that open and close the port") which is not found in '099. The specification does indicate that the sleeve can be moved to a second position that "aligns the ports 920 with the ports 595" to allow a differential pressure to move the arms. '099 Patent 13:13-17. However, the claim at issue, Claim 1, only requires a sleeve that "prevents or allows a differential pressure to translate the at least one movable arm." There are many variations on how the sleeve could perform that action without the incorporation of ports. For example, the sleeve could use seals to prevent or allow the pressure change. Since Claim 1 does not require a sleeve that opens or closes ports, or even just aligns ports, at best Defendant's construction impermissibly imports limits from the

9

specification into Claim 1. See Enercon GmbH v. Int'l Trade Comm'n, 151 F.3d 1376, 1384 (Fed. Cir. 1998) ("This court has repeatedly stated that while claims are to be construed in light of the specification, they are not necessarily limited by the specification. . . . 'Generally, particular limitations or embodiments appearing in the specification will not be read into the claims.'") (internal citations omitted) (quoting Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 867 (Fed. Cir. 1985)).

The Court further agrees with Plaintiff that "selectively actuatable" merely means that the sleeve "can be," or is capable of being, actuated. See, e.g., Oxford Living Dictionary, https://en.oxforddictionaries.com/definition/selection (last visited July 2, 2018) (defining "selection" as "[t]he action [ ] of carefully choosing [ ] something"); https://en.oxforddictionaries.com/spelling/words-ending-in-able-or-ible (last visited July 2, 2018) (defining the suffix "able" as meaning "able to be"). Contrary to Defendant's argument, "selectively" does not necessarily mean that because it can be moved, it will be moved "repeatedly." To the extent Defendant relies on a preferred embodiment[2] for its use of the word "repeatedly," as discussed, its reliance thereon is unwarranted. Phillips, 415 F.3d at 1323.

> **2. "wherein the expandable downhole tool is selectively actuatable to allow or prevent a fluid flowing through the tubular body to translate the at least one moveable arm"** (in Claim 27 of '099)
>
> - **Plaintiff's Construction:** Wherein the expandable downhole tool can be actuated to allow or prevent a fluid flowing through the tubular body to change the position of the at least one moveable arm.

---

[2] Defendant relies on the fact that the specification of '099 incorporates a portion of '999, another patent not at issue here – specifically, that '999 shows the preferred actuator for the tool in '099. See '099 Patent 13:53-57 ("[t]he preferred actuator is the flow switch described and claimed in U.S. Pat. No. 6,289,999 entitled 'Fluid Flow Control Devices and Methods for Selective Actuation of Valves and Hydraulic Drilling Tools,' hereby incorporated herein by reference."). Defendant notes that '999, in turn, provides that the actuator is capable of "multiple actuations," and that the tool can be actuated a "repeated number of times." See ECF No. 84-1, Ex. L, '999 Patent 3:5-6 & 12:64-67.

- **Defendant's Construction:** The downhole tool contains a sleeve that can be repeatedly moved between two positions that open or close the port to prevent or allow fluid flowing through the tubular body which causes the arm to change position.

- **Court's Construction:** Wherein the expandable downhole tool can be actuated to allow or prevent a fluid flowing through the tubular body to change the position of the at least one moveable arm.

This term is closely related to "selectively actuatable sleeve," discussed immediately above. Moreover, it is for the reasons discussed in conjunction with that term that the Court rejects Defendant's construction. Defendant again contends that "selectively" should be defined as "repeatedly." The Court again rejects this construction. Similarly, the Court rejects Defendant's attempt to add additional concepts that are not in Claim 27, specifically, limiting the claim so that it requires a moving sleeve that opens or closes the port.

3. **"differential [fluid] pressure"** (in Claims 1, 30, 33, 35, 39, 45, 48, 50, 54, 57 of '099)

- **Plaintiff's Construction:** A difference between two [fluid] pressures.

- **Defendant's Construction:** The pressure difference between the flowbore and the annulus.

- **Court's Construction:** A difference between two [fluid] pressures.

Given that this term appears in a number of claims, Plaintiff's construction is superior in that it is simple and accurate. Differential is defined as "of, relating to, or constituting a difference." https://www.merriam-webster.com/dictionary/differential (last visited July 2, 2018). There is nothing in the term that limits it to a specific pressure difference. Defendant contends that the only pressure differential described in '099 is between the flowbore and annulus. However, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that

11

embodiment." <u>Phillips</u>, 415 F.3d at 1323.

## III. CONCLUSION

The Court construes the disputed terms as explained above. An appropriate Order follows.